SHEPHERD, FINKELMAN, MILLER
  & SHAH, LLP
JAMES C. SHAH
NATALIE FINKELMAN BENNETT
475 White Horse Pike
Collingswood, NJ  08107
Telephone: 856/858-1770
Facsimile: 866/300-7367
jshah@sfmslaw.com
nfinkelman@sfmslaw.com

*Additional Counsel on Signature Page*

*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GABRIEL PATLAN, RYAN CORNELL and LA DELLA LEVY,<br><br>Plaintiffs,<br><br>v.<br><br>BMW OF NORTH AMERICA, LLC,<br><br>Defendant. | No.<br><br>**CLASS ACTION COMPLAINT** |

Plaintiffs, Gabriel Patlan, Ryan Cornell, and La Della Levy ("Plaintiffs"), individually and behalf of all others similarly situated, bring this action against Defendant, BMW of North America LLC ("BMW" or "Defendant"). Plaintiffs allege the following based on information and belief, the investigation of counsel, and personal knowledge.

## I.     INTRODUCTION

1.      This action concerns two dangerous fire-related defects present in over one million vehicles designed, manufactured, marketed, and sold by BMW.

2.      In October 2017, after intense media scrutiny, consumer complaints, and meetings with the National Highway Transportation Safety Administration ("NHTSA"), BMW initiated recalls for defective blower-motor wiring systems, and Positive Crankcase Ventilation ("PCV") valve heaters (the "Defect(s)" or "Fire-Related Defect(s)), in a variety of BMW vehicles (the "Vehicle(s)" the "Defective Vehicle(s)).

3.      These dangerous Defects cause the Vehicles to spontaneously combust and catch fire, destroying Vehicles, causing personal injury, and damaging property in proximity. These fires have occurred even when the Vehicles are turned off and not in operation.

4.      BMW knew of these Defects at least as early as 2011 and 2012 respectively. Yet, instead of addressing, repairing, or providing an adequate warning of the safety risks to consumers or the NHTSA, BMW concealed the Defects, consistently denied responsibility, and stated publicly that there were no defects related to the BMW Vehicle fires.

5.     In disregard of public welfare and safety, BMW chose instead to blame the fires on consumers, claiming that they resulted from poor maintenance, unauthorized replacement parts, and even rodent nests.

6.     BMW failed to disclose these Fire-Related Defects because it knew the information would affect its reputation, as well as Plaintiffs' and the class (defined below) members' willingness to purchase, own, or drive its vehicles.

7.     However, now seven months on, and after the recall expanded internationally to South Korea and the United Kingdom, BMW has not performed repairs, telling owners of the Defective Vehicles that the replacement parts are still not available.  BMW expects owners to continue driving their Vehicles with this dangerous Fire-Related Defect and wait until BMW is able to perform repairs at an undefined future time.  BMW has advised its customers to keep affected Vehicles parked outdoors and away from homes until they are called in for repair.

8.     Through this class action, Plaintiffs, on behalf of the class, allege that BMW's design, manufacturing, use of materials and workmanship, assembly, promotion, marketing, selling, and otherwise placing into the stream of commerce millions of Vehicles throughout the United States with inherent safety defects, were unlawful, unfair, and fraudulent business practices, and breaches of BMW's warranties.

9.     This class action seeks damages, restitution, equitable relief and any other available remedies for consumers who purchased or leased a Defective Vehicle.

## II.    PARTIES

10.     Plaintiff, Gabriel Patlan ("Patlan"), owns a 2011 BMW 328i, is a citizen of California, and a resident of the city of Parlier.

11.     Plaintiff, Ryan Cornell ("Cornell"), owns a 2011 BMW 328i, is a citizen of California, and a resident of the city of San Diego.

12.     Plaintiff, La Della Levy ("Levy"), owned a 2007 BMW 328i, is a citizen of Nevada, and a resident of Las Vegas.

13.     Defendant, BMW, is one of the world's largest and best-known manufacturers of luxury vehicles. According to its 2017 annual report, in 2017 it sold 352,790 vehicles in North America alone, and did $120 billion in revenue worldwide.

14.     BMW is a Delaware corporation with its principal place of business and North American headquarters located in Woodcliff Lake, New Jersey.

15.     BMW is responsible for the design, manufacture, promotion, marketing, advertising, import, and sale of the Defective Vehicles. BMW also maintains corporate offices and a training center in Montvale, New Jersey, a parts

distribution center in Mount Olive, New Jersey, and a Vehicle Preparation Center in Port Jersey, New Jersey.  BMW is a citizen of Delaware and New Jersey.

## III.    JURISDICTION AND VENUE

16.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331.  This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17.    This Court also has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because at least one class member is of diverse citizenship from Defendant; there are more than 100 class members nationwide; and the aggregate amount in controversy exceeds $5,000,000.

18.    This Court has personal jurisdiction over the parties because Defendant is headquartered in this state, conducts substantial business in this state, has systematic and continuous contacts with this state, and has agents and representatives that can be found in this state.

19.    Venue is proper in this District pursuant to 28 U.S.C. § 1391, because Defendant is a resident of this judicial district, does business throughout this District, and a substantial part of the events or omissions giving rise to Plaintiff's claims took place within this District.  This Court accordingly has jurisdiction over this action and venue is proper in this District.

## IV.    FACTUAL ALLEGATIONS

### A.    BMW's Defective Vehicles Have Dangerous Electrical Safety Defects That Cause Vehicles to Experience Spontaneous Fires

20.    As used in this Complaint, the term "Defective Vehicles" refers to all BMW vehicles purchased in the United States and Territories subject to one or more fire-related recalls due to manufacturing defects in the blower motor and/or the PCV valve heater.[1]

21.    A May 2017 investigation conducted by ABC News exposed this dangerous fire-related safety Defect to the public.  ABC News identified over 40 fires starting spontaneously in BMW Vehicles, involving various models and model years across the country.  The investigation included a comprehensive review of data from fire departments, owner reports, and individual interviews.

---

[1]    The blower-motor wiring system Defect is present in the following vehicles: 2006-2011 3 Series Sedan 323i, 325i, 325xi, 328i, 328xi, 330i, 330xi, 335i, 335xi, M3; 2006-2011 3 Series Wagon 325xi, 328i, 328xi; 2007-2011 3 Series Coupe 328i, 328i xDrive, 328xi, 335i, 335i xDrive, 335is, 335xi, M3; 2007-2011 3 Series Convertible 328i, 335i, 335is, M3; and  2009-2011 3 Series Diesel 335d.

The Positive Crankcase Ventilation valve heater Defect is present in the following vehicles: 2008-2011 1 Series Coupe 128i; 2008-2011 1 Series Convertible 128i; 2007-2011 3 Series Sedan 328i, 328xi, 328i xDrive; 2007-2011 3 Series Wagon 328i, 328xi; 2007-2011 3 Series Coupe 328i, 328xi, 328i xDrive; 2007-2011 3 Series Convertible 328i; 2007-2011 5 Series Sedan 525i, 525xi, 528i, 528xi, 530i, 530xi; 2007 5 Series Wagon 530xi; 2007-2011 X3 SAV X3 3.0si, X3 xDrive30i; 2007-2011 X5 SAV X5 xDrive30i; 2007-2011 Z4 Roadster Z4 3.0i, Z4 3.0si, Z4 sDrive30i; and 2007-2008 Z4 Coupe Z4 3.0si.

22.    Alarmingly, the ABC News investigation revealed that some BMW Vehicles were parked and turned off for hours, even days, before catching on fire, a problem later confirmed by the NHTSA.  For example, in New York, the owner of a 2011 BMW reported that his car spontaneously burst into flames after being parked for eight hours. As pictured below, an owner of a BMW in Brookhaven, Georgia, parked his Vehicle overnight only to return after it was ravished by a fire.[2]



23.    Fires caused by these Defects have not only damaged the Vehicles themselves, but also surrounding property.  One BMW owner identified in the ABC News investigation parked his 2008 BMW X5 in the garage of his home in Olney, Maryland.  His Vehicle was also parked and turned off when it burst into

---

[2]    http://www.dailymail.co.uk/news/article-5049045/BMW-recalls-one-million-luxury-cars-fire-fears.html.

flames, which also engulfed the garage and caused catastrophic damage to his home, as seen in the picture below, which was included in ABC's report.[3]



24.    Similarly, in North Carolina, a mother of three awoke to a fire in the garage of her home that began in her parked 2011 BMW.

25.    Unable to ignore the publicity and outrage from Vehicle owners following the ABC investigation, BMW issued a public statement on May 11, 2017 directly addressing the Vehicle fires and denying responsibility. BMW expressly misled consumers and stated that the Vehicle fires were unrelated to any defect, and further denied that the fires were related to quality or component failures. Instead, BMW blamed Vehicle owners:

> In cases that we have inspected and are able to determine root causes, we have not seen any pattern related to quality or component failure.

---

[3]    https://abcnews.go.com/US/bmw-recalls-million-vehicles-fire-risk/story?id=50922136.

Vehicle fires can result from a wide variety of external reasons and can range from improper accident damage repair, previous vehicle flooding, lack of, or improper preventative maintenance, rodent nesting, unauthorized modifications to the vehicle (such as remote starters, stereo installations, etc.) and even arson.[4]

26.    This public misrepresentation and BMW's failure to acknowledge its responsibility caused Plaintiffs and class members to believe there was no defect, and consequently they did not seek repair, examination, or replacement of their Vehicles.

27.    BMW's failure to acknowledge responsibility did not stop consumers from extensively reporting the Defects to the NHTSA, even well before the ABC News investigation. The following are a sample of the numerous postings on the NHTSA website regarding BMWs affected by the Fire-Related Defects:

- *NHTSA Complaint on December 16, 2013, ID NUMBER: 10556164* THE CONTACT OWNS A 2009 BMW 328 CONV. THE CONTACT STATED THAT BURNING FUMES WERE EMITTED INTO THE VEHICLE. THE VEHICLE WAS TAKEN TO THE DEALER. THE TECHNICIAN DIAGNOSED THAT THE WIRES CONNECTED TO THE A/C HEATER BLOWER AND FUSES BOX WERE BURNING CAUSING IT TO MALFUNCTIONED. AS A RESULT, THE A/C HEATER BLOWER NEEDED TO BE REPLACED. THE MANUFACTURER WAS MADE AWARE OF THE FAILURE. THE VEHICLE WAS NOT REPAIRED. THE FAILURE AND CURRENT MILEAGE WAS 100,000.

---

[4]        https://www.press.bmwgroup.com/usa/article/detail/T0270678EN_US/offical-statement-bmw-of-north-america-on-abc-news-reporting?language=en_US.

- *NHTSA Complaint on February 05, 2015, ID NUMBER: 10681596*
  THE CONTACT OWNED A 2006 BMW 325I. WHILE
  DRIVING APPROXIMATELY 60 MPH, BURNING FUMES
  AND BLACK SMOKE STARTED TO EMIT FROM THE
  DASHBOARD. THE CONTACT MENTIONED THAT
  FLAMES WERE COMING FROM UNDERNEATH THE
  STEERING WHEEL. AS A RESULT, THE DOORS
  LOCKED, THE WINDSHIELD GLASS CRACKED, AND
  THE WIRING WAS SEVERELY BURNED AND CAUSED
  ALL THE WARNING INDICATORS TO ILLUMINATE.
  THE FIRE DEPARTMENT WAS NOTIFIED. THE VEHICLE
  WAS DESTROYED. THE MANUFACTURER WAS
  NOTIFIED OF THE FAILURE. THE APPROXIMATE
  FAILURE MILEAGE WAS 137,000.

- *NHTSA Complaint on September 02, 2015, ID NUMBER:10761125*
  ON 8/21/2015, I WAS DRIVING MY 2009 BMW 335D TO
  WORK WHEN IT SUDDENLY LOST POWER AND
  STARTED SPEWING SMOKE ON JEFFERSON AVE. I
  PULLED OVER NEAR MY WORK AND SAW SMOKE
  SEEPING IN FROM THE STEERING COLUMN. I EXITED
  THE VEHICLE IMMEDIATELY AND OPENED THE
  HOOD AND SAW THAT THE ENGINE COMPARTMENT
  WAS ON FIRE. I RAN INSIDE MY WORKPLACE AND
  GRABBED A FIRE EXTINGUISHER AND CAUTIOUSLY
  RETURNED TO THE VEHICLE.

  AFTER FILING A CLAIM WITH STATE FARM, THE
  CLAIMS ADJUSTER AND PLAZA MOTOR COMPANY
  BMW CAME TO THE DETERMINATION THAT THE
  CAR'S WIRING HARNESS MALFUNCTIONED AND
  THAT THEY'RE GOING TO REPLACE IT. BUT THAT'S
  NOT MY ISSUE. I'M CONCERNED WITH HOW THE FIRE
  STARTED IN THE FIRST PLACE. PLAZA MOTORS NOR
  STATE FARM CAN TELL ME WHY OR HOW IT
  HAPPENED BUT THEY ARE WILLING TO REPLACE THE
  DEFECTIVE PART AND HAVE ME DRIVE THE VEHICLE
  AGAIN WITHOUT ANY ASSURANCES THAT THIS WILL

NEVER HAPPEN AGAIN. I WAS FORTUNATE ENOUGH TO HAD EXITED THE VEHICLE BEFORE THE CAR WAS ENGULFED IN FLAMES AND I WAS ALSO FORTUNATE ENOUGH TO HAD BEEN CLOSE TO A FIRE EXTINGUISHER.

MY COMPLAINT IS THAT I FEEL LIKE MY CLAIM IS BEING HANDLED IN A VERY LEISURELY, RUN-OF-THE-MILL MANNER AKIN TO CHANGING A FLAT TIRE OR A DENTED BUMPER. BUT A CAR SPONTANEOUSLY CATCHING FIRE IS ANYTHING BUT TYPICAL. PLAZA MOTORS AND STATE FARM'S CASUAL NATURE IS DISCONCERTING TO SAY THE LEAST. I DO NOT FEEL SAFE DRIVING THIS CAR EVER AGAIN.

I DON'T FEEL LIKE BMW IS TAKING ANY RESPONSIBILITY FOR THEIR CATCH SPONTANEOUSLY CATCHING FIRE. ALSO, ONE WEEK PRIOR TO THE FIRE, I HAD A DIAGNOSTICS TEST CONDUCTED ON MY CAR BY AUTOHAUS BMW IN ST. LOUIS, MO AND THE TWO MINOR ISSUES WERE UNRELATED TO THE ELECTRICAL FIRE.

- *NHTSA Complaint on June 23, 2017, ID NUMBER: 11000823*
  THE CONTACT OWNS A 2008 BMW 328XI. WHILE THE VEHICLE WAS PARKED IN THE GARAGE, A FIRE STARTED WITHOUT WARNING. THE CONTACT WAS ABLE TO NOTIFY THE FIRE DEPARTMENT AND A FIRE INSPECTOR EXTINGUISHED THE FLAMES. A FIRE INSPECTION REPORT WAS NOT PROVIDED AT THE TIME. THE FIRE BEGAN NEAR THE INSTRUMENT PANEL AND THE FRONT PASSENGER SIDE OF THE VEHICLE. THE INSURANCE COMPANY AND MANUFACTURER WERE NOTIFIED AND THE CONTACT WAS WAITING FOR THEM TO INVESTIGATE THE CAUSE OF THE FAILURE. THE DEALER WAS NOT CONTACTED. THE VEHICLE WAS PARKED AT THE CONTACT'S RESIDENCE AND WAS UNABLE TO BE DRIVEN. THE FAILURE MILEAGE WAS NOT AVAILABLE.

- *NHTSA Complaint on September 26, 2017, ID NUMBER:11029981* THE CAR CAUGHT ON FIRE RIGHT BEHIND THE GLOVE BOX. THE FIREFIGHTERS SAID IT WAS AN ELECTRICAL FIRE. THE CAR WAS OFF AND PARKED IN A RESTAURANT PARKING LOT. THIS HAPPENED ON 9/22/17. SOMEONE SAW THE CAR ON FIRE IN THE PARKING LOT AND CALLED THE FIRE DEPARTMENT. THIS HAPPENED AROUND 6:00PM. SEVEN HOURS LATER, THERE WERE STILL BUZZING SOUNDS COMING FROM UNDER THE DASH. WE WERE TOLD NOT TO DRIVE THE CAR!

- *NHTSA Complaint on December 08, 2017, ID NUMBER: 11053485* THE CAR HAS HAD A STRONG SMELL OF MELTING PLASTIC COMING FROM THE AIR FLOW IN THE VEHICLE. IT HAS HAPPENED OVER THE COURSE OF 3 WEEKS AND NOT SURE WHAT THE MELTING PLASTIC IS COMING FROM. IT HAPPENS WHEN THE CAR IS IN MOTION AND ESPECIALLY WORSE WHEN THE HEATER IS ON.

- *NHTSA Complaint on December 26, 2017, ID Number: 11053485* 2 RECALLS NEEDED: 17V-676: BLOWER MOTOR WIRING AND 17V-683: PCV VALVE HEATER. GOT A LETTER FROM BMW SAYING THESE RECALLS ARE NOT READY BUT MY CAR HAS A REALLY BAD BURNING SMELL FROM THE AIR VENTS AND NEED IT FIXED AS SOON AS POSSIBLE.

28.    On May 16, 2017, following the ABC investigation and further consumer complaints, the NHTSA publicly urged consumers to report safety concerns or incidents related to fires in BMW Vehicles.

29.    The NHTSA then commenced its own investigation and obtained data from the ABC News report and additional data from BMW regarding fire-related incidents.  NHTSA officials met with BMW regarding the Fire-Related Defects.

30.     On October 8, 2017, following its meetings with the NHTSA, BMW immediately initiated two recalls affecting approximately 1.4 million vehicles, and acknowledged that defective blower-motors and/or (2) PVC valve heaters caused fires in the Defective Vehicles.

31.     BMW issued letters to owners on or about December 18, 2017, informing them of the Defects and announcing that BMW planned to make repairs of these and other affected components.  On information and belief, as of May 2018, BMW has not commenced its repair program.

32.     BMW's October 2017 recall has done little to protect owners of the Defective Vehicles from this ongoing threat, and Vehicles continue catching on fire.  For example, on April 27, 2018 in North Carolina, a BMW that was turned off and parked in a residential garage burst into flames and destroyed the owner's home.[5]  Other BMW fires were reported on April 19 in Miami, Florida, and April 24 in Fort Wayne, Indiana.[6]  As reported by WANE, the image below captures the BMW engulfed in flames in Fort Wayne, Indiana.

---

[5]     https://www.wsoctv.com/news/local/fire-rips-through-wesley-chapel-home/739900487.
[6]     http://www.wane.com/news/local-news/bmw-destroyed-by-fire-during-move/1137448209; https://patch.com/florida/miami/burning-bmw-sets-fire-alarm-miami-target.



**B.      The Blower-Motor Defect**

33.      NHTSA Campaign Number 17V-676 includes a recall of 672,775 BMW Vehicles due to a defective blower-motor. The blower-motor is a component that controls the air flow for the heating and cooling system in the Defective Vehicles.  The blower-motor's air flow is controlled by a component called a blower-regulator.  The blower-regulator uses a wiring harness with connectors that are coated with a tin material at their ends.

34.      BMW admits that defects inherent in the materials, workmanship, manufacturing, assembly, or design of the tin-coated connectors between the wiring harness and the blower-motor regulator could lead to corrosion, which results in overheating, melting at the connection point, and fire.

35.      BMW's knowledge of a safety defect related to the blower motor dates back to incidents in 2007 and 2008 reported to and investigated by BMW.

36.    In these incidents, fires were reported to have originated in and/or damaged the heating and cooling systems in two model year 2006 BMW 3 Series sedans.  After inspecting both vehicles, BMW did not publicly release any conclusions regarding the cause of these fires.

37.    According to the NHTSA Safety Recall Report, BMW received reports of additional fires originating in the heating and cooling systems through 2011.  By this time BMW concluded that a defect in the blower-motor wiring harness caused Vehicle fires, thus identifying the defect.

38.    The Safety Recall Report also states that in May 2011, BMW implemented changes to the design or manufacturing of the blower-regulator. Specifically, BMW changed the coating of its wiring harness end connectors from tin to silver to prevent vehicle fires in future model year BMW vehicles.

39.    Yet, even after making this discovery at least as early as 2011, and quietly changing the manufacturing or design of the wiring harness, BMW failed to notify its customers, failed to correct the defect in the Defective Vehicles, and failed to notify the NHTSA.  Instead, as noted, BMW shifted the blame to consumers.

40.    BMW was notified of at least three additional field incidents involving fires in two model year 2006 3 Series sedans and one model year 2008 3 Series sedan in 2015.  In all three incidents, Vehicle passengers sustained serious

injuries.  Again, even after these incidents, BMW did not warn consumers or repair the Defective Vehicles.

41.    Further fires originating in the Vehicle heating and cooling systems continued to be reported to BMW.  Despite being inundated with complaints regarding this issue since 2007, and identifying the defect in 2011, it was not until the problem garnered publicity, consumer outrage, and the attention of the NHTSA in 2017 that BMW acknowledged these Defects and initiated a recall.

## C.    The Positive Crankshaft Ventilation Valve Heater Defect

42.    NHTSA Campaign Number 17V-683 includes a recall of 740,561 BMW Vehicles due to a defective PCV valve heater.  The PCV system removes harmful vapors from the engine and prevents those vapors from being expelled into the atmosphere.  The PCV valve heater prevents the engine's PCV system from freezing.

43.    BMW admits that defects inherent in the materials, workmanship, manufacturing, assembly, or design of the plastic material coating the heater valve allow moisture to accumulate and degrade the plastic components, and which leads to overheating, melting, and fire.

44.    BMW's knowledge of a possible safety defect related to the PCV valve heater dates back to 2009, when similar fire incidents originated in the engine compartment of a model year 2007 X5 SAV and a model year 2006 3

Series sedan.  In 2010, additional incidents were reported involving fire damage to the engine compartment in various models and model years.

45.    As a result, BMW initiated a parts-return program, and in 2011 and 2012 identified the Defect through testing and analysis of returned parts.  BMW concluded that a defect in the PVC valve heater caused the risk of fire.

46.    Although it identified the Defect at least as early as 2012, BMW failed to notify owners of the Defective Vehicles, failed to correct or repair the Defect, and failed to notify the NHTSA.  It was not until the problem garnered publicity, consumer outrage, and the attention of the NHTSA in 2017 that BMW acknowledged these Defects and initiated a recall.

**D.    BMW Falsely Represented the Defective Vehicles as Safe, Reliable, and of High-Quality**

47.     At the heart of BMW's marketing campaign is its consistent promotion that its vehicles are designed for safety.  For example, on its website, BMW lists "safety" as one of the primary ownership benefits associated with its vehicles and states prominently:  "Before you step into a BMW, we do our best to try to make sure you can walk away from one."  BMW further publicly advertises that "it's not just about greater power and more efficient performance.  It's also about safety.  We prepare our vehicles to expect the unexpected."

48.    In describing its safety features, BMW publicly represents that its vehicles are "known for offering the most advanced safety features, and this is one

of the reasons drivers choose this luxury brand over the competition. With standard and optional safety features that lead the class, BMW vehicles are equipped to keep you and your family safe, no matter where you travel."

49.    BMW further represents that "product responsibility is a central concern of the BMW Group–from fuel-efficient drive technologies through innovative mobility services to safety aspects."

50.    Additionally, BMW represents the safety and quality of its vehicles by headlining that its vehicles are "nothing less than exceptional." These and other false representations induced Plaintiffs and other consumers to buy BMW's Defective Vehicles.

### E.    BMW Warrants That It Will Repair Vehicle Defects

51.    BMW's express written warranty for the Defective Vehicles states that "BMW North America LLC warrants … against defects in materials or workmanship to the first retail purchaser, and each subsequent purchaser."

52.    BMW's express warranty period is "48 months or 50,000 miles, whichever occurs first" and coverage begins on "the date of first retail sale."

53.    BMW admitted that its Defective Vehicles were distributed or sold to consumers with defective components. The Vehicles were defective immediately upon purchase when they left the exclusive control of BMW. Accordingly, BMW breached its express warranty to the Plaintiffs and class members.

54.     The inherent defects in BMW's Defective Vehicles were incapable of detection by Plaintiffs or any class members upon purchase.  Plaintiff and class members reasonably and in good faith relied upon BMW's representations regarding the quality and safety of its vehicles and component parts.

55.     BMW was and is under a continuous duty to disclose to Plaintiff and class members safety and quality issues relating to its vehicles.  BMW knowingly and affirmatively misrepresented and/or failed to disclose the Defects associated with the Defective Vehicles, as discussed above.

56.     Plaintiffs and class members reasonably relied upon BMW's knowing and affirmative representations regarding its warranties, and the safety and quality of the purchased vehicles.  Therefore, BMW is estopped from relying on any warranty limitations in defense of this action.   Any such limitation of the warranties, or the time frame within which to bring claims, is unconscionable and void because of BMW's knowledge of the Defects at the time of sale or shortly thereafter.

**F.     Factual Allegations Relating to Plaintiffs**

*Plaintiff Ryan Cornell*

57.     Cornell purchased a 2011 BMW 328i on September 14, 2016.  He chose to purchase a BMW based on its warranty, advertisements, testimonials, and

marketing materials touting BMW's manufacturing quality, as well as its purported commitment to safety and driving performance.

58.    Cornell would not have purchased his 328i if he had known that BMW had concealed a material safety defect that could lead his car to burst into flames, and that its representations concerning the manufacturing quality and safety of the Vehicle were untrue.

59.    On or about November 2017, Cornell received a letter from BMW informing him of the defect present in his Vehicle.

60.    On or about May 2, 2018 Cornell contacted BMW to request immediate repair of his Vehicle, but was informed by BMW employees that they were unable to repair his Vehicle.

61.    Cornell is entitled to a Vehicle that operates and functions as warranted.

62.    Cornell suffered injury due to the misconduct described herein. Cornell now owns a BMW 328i that has been significantly diminished in value, and does not perform the basic function for which it was purchased without the risk of fire.

63.    BMW did not offer to provide Cornell with a rental vehicle, reimburse him for out-of-pocket expenses, or compensate him for the loss of vehicle value.

*Plaintiff Gabriel Patlan*

64.    Patlan purchased a 2011 BMW 328i on September 10, 2015. He chose to purchase a BMW based on its written warranty, advertisements, testimonials, and marketing materials touting BMW's manufacturing quality, as well as its commitment to safety and driving performance.

65.    Patlan would not have purchased his 328i if he had known that BMW had concealed a material safety defect that could lead his Vehicle to burst into flames, and that its representations concerning the manufacturing and safety of the Vehicle were untrue.

66.    On or about December 2017 Patlan received a letter from BMW informing him of the blower motor and PCV valve heater Defect present in his Vehicle, and informing him that he would be contacted by BMW for repair.

67.    On or about January 17, 2018, Patlan contacted BMW to request immediate repair of his Vehicle, but was informed by BMW employees that they were unable to repair his Vehicle. Plaintiff has not heard from BMW since that time.

68.    Patlan then attempted to sell his Vehicle in January 2018. Despite coming to an agreement on the general terms of sale with a buyer, the buyer backed out after learning about the Fire-Related Defects.

69.    Patlan is entitled to a Vehicle that operates and functions as warranted.

70.    Patlan suffered injury due to the misconduct described herein.  Patlan now owns a BMW 328i that has been significantly diminished in value, and does not perform the basic function for which it was purchased without the risk of fire.

71.    BMW did not offer to provide Patlan with a rental vehicle, reimburse him for out-of-pocket expenses, or compensate him for the loss of Vehicle value.

***Plaintiff La Della Levy***

72.    Levy purchased a 2007 BMW 328i in 2010.  She chose to purchase a BMW based on advertisements, testimonials, and marketing materials touting BMW's manufacturing quality, as well as its purported commitment to safety and driving performance.

73.    On September 16, 2015 Levy went to sleep with her BMW 328i turned off and parked in the driveway of her home.

74.    The next morning, Plaintiff awoke and discovered her car burned beyond repair.  The car caught on fire during the night and was destroyed along with a number of personal belongings.

75.    The car was examined by "BMW Only," an auto repair shop in Las Vegas.  Levy's insurance company informed her that the car suffered an electrical fire.

76.    Levy would not have purchased her 328i if she had known that BMW had concealed a material safety defect that would cause it to spontaneously catch fire, and that BMW's representations concerning the manufacturing quality and safety of the Vehicle were untrue.

77.    Levy is entitled to a Vehicle that operates and functions as warranted without the risk of fire.

78.    Levy suffered injury due to the misconduct described herein.  Levy lost the entire value of her BMW 328i, was forced to pay certain out-of-pocket expenses related to the fire and the loss of her Vehicle, pays higher insurance premiums as a result of the fire, and lost a number of personal belongings in the fire.

79.    BMW did not offer to reimburse Levy for the loss of the Vehicle, the loss of her personal property, or her out-of-pocket expenses.

**G.    Injury**

80.    BMW has shown a deliberate disregard for the welfare and safety of the public by its concealment of the nature and extent of these Fire-Related Defects, and its continued failure to make the appropriate repairs.

81.    As a result of BMW's misconduct, Plaintiffs and class Members have suffered actual and particularized injury, including ascertainable loss, because the Defective Vehicles have at least one, and in some cases two, defects, which pose

ongoing threats to occupants and have diminished the value of the affected Vehicles. All purchasers of the Defective Vehicles overpaid for their Vehicles. A vehicle purchased or leased under the reasonable assumption and advertised as "safe" is worth more than a Defective Vehicle known to have the risk of spontaneous fire even when turned off. Furthermore, the public disclosure of the Defects caused the value of the Defective Vehicles to materially diminish.

82.    BMW has advised owners and lessees of the risk of fires due to the Defect. However, BMW has not repaired the Defective Vehicles, and owners and lessees are expected to either cease driving their cars or continue driving their cars with dangerous Defects. Owners and lessees have not been offered compensation for rental car or other expenses related to the Defect.

83.    By reason of the conduct described herein, and as a direct and proximate result of BMW's concealment and nondisclosure of the safety Defects, Defendant caused concrete and particularized injury to Plaintiffs and each member of the class.

## V.     STATUTE OF LIMITATIONS TOLLING

### A.     Discovery Rule Tolling

84.    Plaintiffs and class members had no way of knowing about the fire-related defects and other information concealed by BMW. Any statutes of limitations were tolled by BMW's knowing and active omission of the fact that the

Defective Vehicles contain one or more electrical safety defects that cause vehicle fires.

85.    Within the period of any applicable statutes of limitation, BMW withheld vital information from Plaintiffs and class members necessary to the pursuit of any legal claims. Plaintiffs, thus, could not have discovered through the exercise of reasonable diligence that BMW was concealing defects and misrepresenting its true position on safety issues.

86.    Plaintiffs and the other class members did not discover, and did not know of facts that would have caused a reasonable person to suspect, that BMW had information in its possession about the existence of safety Defects.

87.    All applicable statutes of limitation have been tolled by operation of the discovery rule.

**B.    Fraudulent Concealment Tolling**

88.    All applicable statutes of limitation have also been tolled by BMW's knowing and active fraudulent concealment and denial of the facts alleged herein.

89.    Instead of disclosing the safety Defects in the Defective Vehicles of which it was well aware, BMW falsely represented that the Vehicles were safe, reliable, and of high quality, and that it was a reputable manufacture.

###### C.    Estoppel

90.    BMW was and is under a continuous duty to disclose to Plaintiffs and other class members the true character, quality, and nature the Defects inherent in the Defective Vehicles.

91.    At all relevant times, BMW knowingly, affirmatively, and actively misrepresented and omitted the true character, quality, and nature of the problems caused by these Defects.  BMW is estopped from relying upon any statutes of limitation in defense of this action.

### VI.    NEW JERSEY'S SUBSTANTIVE LAW APPLIES TO THE PROPOSED CLASS

92.    New Jersey's substantive laws apply to the proposed class, as defined herein.

93.    New Jersey's substantive laws may be constitutionally applied to the claims of Plaintiffs and the class under the Due Process Clause, 14th Amend., § 1, and the Full Faith and Credit Clause, art. IV., § 1, of the U.S. Constitution.  New Jersey has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiffs and all class members, thereby creating state interests that ensure that the choice of New Jersey state law is not arbitrary or unfair.

94.    Defendant's United States headquarters and principal place of business is located in New Jersey.  Defendant also owns property and conducts substantial business in New Jersey and, therefore, New Jersey has an interest in

regulating Defendant's conduct under its laws.  Defendant's decision to reside in New Jersey and avail itself of New Jersey's laws renders the application of New Jersey law to the claims herein constitutionally permissible.

95.    A substantial number of members of the class also reside in New Jersey and bought Defective Vehicles in New Jersey.

96.    Defendant's alleged misconduct emanated from New Jersey.

97.    Defendant's conduct similarly injured and affected Plaintiffs and class members.  For instance, Defendant's marketing and engineering efforts relating to the Defective Vehicles, as well as its warranty decisions, were undertaken and orchestrated from its headquarters in New Jersey.

98.    The application of New Jersey's laws to the class also is appropriate under New Jersey's choice-of-law rules because New Jersey has significant contacts to the claims of Plaintiffs and the class, and New Jersey has a greater interest in applying its laws here than in any other interested state.

## VII.   CLASS ACTION ALLEGATIONS

99.    This action is brought, and may be properly maintained, as a class action under Rule 23 of the Federal Rules of Civil Procedure.  All requisite elements of Fed. R. Civ. P. 23(a) and 23 (b)(3) are satisfied; there is a well-defined community of interests in the litigation; the proposed class and any subclasses are ascertainable; and a single class action is the superior manner to proceed when

compared to the joinder of hundreds of thousands of plaintiffs or tens of thousands of individual cases challenging the same practices.

**The National Classes**

100.    Plaintiffs brings this class action on behalf of themselves, and under the provisions of Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, as a class action on behalf of the following National Class:

> All persons or entities in the United States and its Territories who own or lease one or more of the Defective Vehicles.

101.    Plaintiffs bring this case on behalf of the following National Fire Class:

> All persons or entities in the United States and its Territories who owned or leased one or more of the Defective Vehicles and experienced fire-related damage to their vehicles or property.

**The State Classes**

102.    Plaintiffs allege statewide class action claims on behalf of the following classes in the following state subclasses. Each of these State Classes is defined as follows:

> All persons or entities in the State of California who own or lease one or more of the Defective Vehicles.

> All persons or entiles in the State of California who owned or leased one or more of the Defective Vehicles and experienced fire-related damage to their vehicles or property.

> All persons or entities in the State of Nevada who own or lease one or more of the Defective Vehicles.
>
> All persons or entities in the State of Nevada who owned or leased one or more of the Defective Vehicles and experienced fire-related damage to their vehicles or property.

103.   The National Class, National Fire Class, and the State Classes, and their members are referred to herein as the "Class" or the "Classes."

104.   The Class Period for the Class and each subclass dates back to the longest applicable statute of limitations for any claims asserted on behalf of that Class or subclass from the date this action was commenced, and continues through the present and to the date of judgment.

105.   Excluded from the Class and any subclass is Defendant, its current employees, co-conspirators, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliated companies; the undersigned counsel for Plaintiffs; and the Judge and Court staff to whom this case is assigned.   Plaintiffs reserve the right to amend the definition of the Class or subclasses if discovery or further investigation reveals that they should be expanded or otherwise modified.

106.   This action satisfies the predominance, commonality, typicality, numerosity, superiority, adequacy, and all other requirements of Rule 23 of the Federal Rules of Civil Procedure.

- <u>Numerosity</u>: The members of the Class and subclasses are so numerous that joinder of all members is impracticable. The precise number of members is unknown at this time, but Defendant has disclosed that there are a total of 1.4 million Vehicles subject to one or both recalls.    The precise number of Class members can be ascertained by reviewing Defendant's records.

- <u>Commonality and Predominance</u>: Common question of law and fact exist as to all members of the Class and subclasses, and predominate over any questions that affect only individual members of the Class and each subclass.  Plaintiffs' claims and the claims of the proposed Class members all derive from a common nucleus of operative facts. That is, irrespective of the individual circumstances of any proposed Class member, liability in this matter will rise and fall with core issues related to Defendant's conduct.  Common legal and factual questions include, but are not limited to, the following:

(1)    Whether the Defective Vehicles suffer from one or more Defects;

(2)    Whether these Defects cause the risk or occurrence of fire;

(3)    Whether the Defective Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the defective components;

(4)    Whether Defendant knew or should have known about the Defects, and how long the Defendant knew of the Defects;

(5)    Whether Defendant made misrepresentations, omissions, or concealed material facts about the Defective Vehicles.

(6)    Whether the defective nature of the Defective Vehicles constitutes material facts reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle;

(7)    Whether Defendant had a duty to disclose the defective nature of the Defective Vehicles to Plaintiffs and Class members;

(8)    Whether Defendant's conduct tolls any or all applicable limitations period by acts of fraudulent concealment, application of the discovery rule, or equitable estoppel;

(9)    Whether Defendant's conduct violated state consumer statutory provisions;

(10)    Whether Defendant engaged in a practice or act that it knew or reasonably should have known to be an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact;

(11)    Whether Plaintiffs and the Class were harmed and suffered damages, including suffering ascertainable loss, as a result of Defendant's conduct and, if so, the appropriate amount thereof; and

(12)    Whether, as a result of Defendant's misconduct, Plaintiffs and the Class are entitled to equitable relief and, if so, the nature of such relief.

- <u>Typicality</u>: Plaintiffs' claims are typical of the claims of the members of the Class and subclass to which they belong.  Plaintiff and all Class

members were subjected to Defendant's common business practices, described above, and assert common legal claims that are typical of those of the Class and each subclass.  Plaintiffs and members of the Class and subclasses have sustained damages arising out of Defendant's wrongful and deceptive conduct as alleged herein. Resolution of the common issues presented in Plaintiffs' cases will resolve them in a common and typical manner for other members of the Class and subclasses.

- Adequacy: Plaintiffs are adequate representatives of the Class because their interests do not conflict with the interests of the members of the Class and subclasses they seek to represent; they have retained counsel competent and experienced in complex class action litigation; and Plaintiffs intend to prosecute this action vigorously in the best interests of the Class and subclasses.  The interests of the Class and subclasses will be fairly and adequately protected by Plaintiffs and counsel.

- Superiority: A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because individual litigation of the claims of all Class members is economically infeasible and procedurally impracticable.  Furthermore,

the expense and burden of individual litigation make it difficult or impossible for members of the Class to individually redress the wrongs done to them.  Individual members of the Class do not have a significant interest in individually controlling the prosecution of separate actions, and individualized litigation presents the potential for inconsistent or contradictory judgments.  There will be no difficulty in the management of this class action.  A class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

107.   A class should also be certified under Fed. R. Civ. P. 23(b)(2). Defendant has acted or refused to act on grounds generally applicable to the Class and subclasses, making appropriate final injunctive relief or corresponding declaratory relief with respect to the Classes.

108.   In the alternative, this Class and each subclass may be certified under Fed. R. Civ. P. 23(c)(4) with respect to particular issues.

## VIII.  CLAIMS FOR RELIEF

### COUNT I
### Violations of New Jersey Consumer Fraud Act ("CFA")
### N.J.S.A. § 56:8-1, *et seq.*
### (On Behalf of the National Class and National Fire Class)

109.  Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

110.  The CFA was enacted and designed to protect consumers against unfair, deceptive and fraudulent business practices. N.J. Stat. Ann. §56:8-1, *et seq.*

111.  N.J. Stat. Ann. §56:8-2 provides:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression, or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice . . . .

112.  Plaintiffs, other members of the Class, and BMW are "persons" within the meaning of the CFA.

113.  The Defective Vehicles manufactured and sold by BMW are "merchandise" within the meaning of the CFA, and Plaintiffs and other members of the Class and Subclass are "consumers" within the meaning of the CFA and, thus, are entitled to the statutory remedies made available in the CFA.

114.   BMW, through its advertisements and public statements regarding the Defective Vehicles' safety, manufacturing quality, and warranties noted above, used unconscionable commercial practices, deception, fraud, concealment, false promises, and misrepresentations, in violation of the CFA, in connection with the marketing and sale of the Defective Vehicles.

115.   BMW also knowingly concealed, suppressed, and consciously omitted material facts to Plaintiffs and other Class members regarding the nature of the Fire-Related Defects.

116.   These acts and omissions directly and proximately caused Plaintiff and other members of the Class to suffer an ascertainable loss in the form of, *inter alia*, money spent purchasing the Defective Vehicles and other out-of-pocket expenses, together with appropriate penalties, including treble damages, attorneys' fees, and costs of suit.

117.   The CFA is, by its terms, a cumulative remedy, such that remedies under its provisions can be awarded in addition to those provided under separate statutory schemes.

## COUNT II
### Breach of Express Warranty
#### (On Behalf of the National Class, National Fire Class, and the State Classes)

118.   Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

119.    Defendant is a "merchant" as defined by the relevant statutes.

120.    The Defective Vehicles are "goods" as defined by the relevant statutes.

121.    As described herein, BMW expressly warranted against defects in workmanship or materials.  That promise served as the basis of the bargain between the parties and therefore constituted an express warranty.

122.    Defendant intended that consumers would rely on those warranties when purchasing or leasing the Defective Vehicles.

123.    On the basis of the representations regarding the warranty, Plaintiffs and Class members agreed to purchase and/or lease the Defective Vehicles.  An express warranty therefore became part of the basis of the bargain.

124.    Plaintiffs and the Class have performed all conditions, covenants, and promises required on their part to be performed in accordance with the terms and conditions of the purchase or lease contract.

125.    The goods Plaintiffs and the Class received did not conform to BMW's express warranty as alleged above, in that the Defective Vehicles had one or more Fire-Related Defects that remain unrepaired.

126.    Had Defendant disclosed the Fire-Related Defects, Plaintiffs and Class members would not have purchased or leased the Defective Vehicles or would not have been willing to pay as much for the Vehicles.

127. BMW has failed to replace the non-conforming goods with goods conforming to Defendant's express warranty as to Plaintiffs and the Class, or to compensate Plaintiffs and the Class in any way for the diminished value of the goods supplied.

128. Plaintiffs provided notice to BMW of this breach of warranty by letter dated May 18, 2018, sent by certified mail, return receipt requested.

129. Plaintiffs Patlan and Cornell also notified BMW of its breach of its express warranty prior to the filing of this complaint by personally contacting BMW after learning of the defects and attempting to obtain immediate repair and replacement from BMW.

130. Defendant was also provided notice of its breach of express warranty through its own knowledge of the defects by instituting a recall.

131. As a direct and proximate result of BMW's breach of express warranty, Plaintiffs and the Class have been damaged in an amount to be proven at trial. The precise amount of these damages is unknown at the present time but is in excess of the jurisdictional limits of the Court.

**COUNT III**
**Breach of Implied Warranty**
**(On Behalf of the National Class, National Fire Class, and the State Classes)**

132. Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

133.    Defendant is a "merchant" as defined by the relevant statutes.

134.    The Defective Vehicles sold and leased to Plaintiffs and members of the Class are "goods" as defined by relevant statutes.

135.    BMW, as the designer, manufacturer, marketer, distributor, and/or seller, impliedly warranted that the Defective Vehicles were of merchantable quality and, among other warranties, that the Defective Vehicles would pass without objection in the trade or industry, and were and are fit for the ordinary purpose for which cars are used, such as driving and being parked without the risk of spontaneous fires.

136.    The Defective Vehicles, when sold and at all times thereafter, were not in merchantable condition and are not fit for the ordinary purpose for which cars are used. In fact, the Defective Vehicles cannot perform the ordinary purpose of being driven or parked without the risk of spontaneous fire, and would not pass without objection in the automobile industry.

137.    BMW breached its implied warranties by selling, marketing, and manufacturing Defective Vehicles that cause the risk of spontaneous fires, as discussed herein.

138.    The Defective Vehicles were manufactured or designed defectively, and delivered to consumers as such. Therefore, they were defective immediately upon purchase or lease when they left the exclusive control of Defendant, and

Defendant has breached the implied warranty of merchantability with respect to all Plaintiffs and Class members.

139.    Had the Fire-Related Defects been disclosed to the public, Plaintiffs and Class would not have purchased or leased the Defective Vehicles, or would have paid less, because the vehicles do not comply with Defendant's representations and implied warranties.

140.    Defendant was provided notice of its breach through its own knowledge of the Defects by instituting a recall, the instant Complaint, and communications transmitted by Plaintiffs and the Class before or within a reasonable amount of time after Defendant issued the recalls and the allegations of fire dangers became public.

141.    Plaintiffs also notified Defendant of its breaches in a letter mailed via certified mail on May 18, 2018.   Despite being notified, Defendant has not provided Plaintiffs and Class with a product that conforms to the qualities and characteristics that it warranted when it sold the Defective Vehicles.

142.    As a direct and proximate cause of the Defendant's breach of implied warranties, Plaintiffs and Class members have sustained damages, including economic loss equal to the purchase price of the Defective Vehicles, or the difference in value between the Vehicle as warranted and as actually sold, and out-of-pocket expenses related to the defect.

## COUNT IV
## Violations of California's Consumer Legal Remedies Act ("CLRA")
## Cal. Civ. Code §§ 1750, *et seq*.
## (<u>On Behalf of the California Class and California Fires Class</u>)

143.    Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

144.    The California Legal Remedies Act ("CLRA") prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).  BMW engaged in unfair or deceptive acts or practices that violated the CLRA, as described herein.

145.    BMW is a "person" under Cal. Civ. Code § 1761(c).

146.    Plaintiff and the Class are "consumers" as defined by Cal. Civ. Code § 1761(d) by virtue of their purchase of the Defective Vehicles.

147.    The transactions at issue involve "goods" as that term is defined in Cal . Civ. Code 1761.

148.    BMW violated the following provisions of the CLRA:

  a.    Cal. Civ. Code § 1770(a)(5): "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have…";

  b.    Cal. Civ. Code 1770(a)(7): "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.;

      c.     Cal. Civ. Code § 1770(a)(9): "[a]dvertising goods or services with intent not to sell them as advertised."

      d.     Cal. Civ. Code § 1770(a)(16): "Representing that the subject of a transaction has been supplied in accordance with a previous representation when it has not."

149.   In violation of Cal. Civ. Code § 1770(a)(5), BMW represented that the Defective Vehicles were safe, reliable, high-quality, and warranted against defects, among the other representations described herein. Instead, as alleged herein, the Defective Vehicles harbored a dangerous electrical defect that can cause the Vehicles to spontaneously catch on fire, and BMW failed to make appropriate repairs or replacement.

150.   In violation of Cal. Civ. Code § 1770(a)(7), BMW represented that the Defective Vehicles were of a certain standard, quality, and grade; namely, that they were warranted against defects, safe, reliable, and high quality, among other representations.  Instead, as described herein, BMW had exclusive knowledge that the Defective Vehicles harbored a dangerous fire-related defect.

151.   In violation of Cal. Civ. Code § 1770(a)(9), Defendant advertised the Defective Vehicles as being warranted against defects, safe, reliable, high quality, among other statements, despite knowing of the Defects.  Defendant nevertheless continued to sell and market its Vehicles using the same representations and warranties, which demonstrated an intent not to sell the Vehicles as advertised.

152.   In violation of Cal. Civ. Code § 1770(a)(16), Defendant represented that each Defective Vehicle purchase was in accordance with previous representations that the Vehicles were warranted against defects, safe, reliable, and high quality among other representations.

153.   BMW also violated Cal. Civ. Code § 1770 in the course of its representations and advertisements regarding the Defective Vehicles by concealing the material defects in Plaintiffs' Vehicles as described herein and otherwise knowingly misrepresenting material facts regarding the existence and effect of the Defects, and engaging in activities with a tendency to deceive with intent that others rely upon their concealment, suppression, or omission in connection with the sale and marketing of the Defective Vehicles.

154.   In fact, in at least as early as 2007, BMW knew of serious defects in the Defective Vehicles owned by Plaintiffs and the Class.  BMW failed to disclose and actively concealed the defects in Plaintiffs' Vehicles, which it marketed as safe, reliable and of high quality, which further constitute unfair and deceptive business practices in violation of the CLRA.

155.   BMW's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their vehicles.

156.   BMW knew or should have known that its conduct violated the CLRA.  BMW's concealment of the Defects in Plaintiffs' Vehicles was material to Plaintiffs' decision whether to purchase the Defective Vehicles.

157.   As a direct and proximate result of BMW's violations of the CLRA, Defective Vehicle owners suffered injury by being deprived of the benefit of their bargain because the Vehicles they purchased were worth less than they would have been if they were free from dangerous electrical defects and loss of other out-of-pocket expenses.  Had Defective Vehicle owners and lessees been aware of the Defects in their Vehicles, they would have either not purchased or leased their Defective Vehicles or would have paid less for them.

158.   Under Cal. Civ. Code § 1780(a), Plaintiffs seek monetary relief against BMW for the harm caused by its violations of the CLRA, as alleged herein.

159.   On May 18, 2018, Plaintiffs provided written notice, through a Consumer Legal Remedies Act ("CLRA") demand letter sent via certified U.S. mail, return receipt requested, as required by Civil Code § 1782(a), to BMW, regarding violations of the CLRA, and demanded that BMW remedy the below-referenced violations within 30 days from receipt of the written notice.

**COUNT V**
**Violation of California's Unfair Competition Law ("UCL")**
**Cal. Bus. Prof. Code §17200, *et seq*.**
(**On Behalf of the California Class and California Fires Class**)

160.    Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

161.    The UCL prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue, or misleading advertising…."

162.    Defendant is a "person" under Cal. Bus. Prof. Code §17201.

163.    BMW violated all three prongs of the UCL by its misconduct alleged herein.

164.    BMW marketed its Vehicles as being safe, high quality, and warranted them against defects on its website and in print materials, including the written warranty, which constituted unlawful, unfair, and fraudulent business practices. These practices were likely to deceive a reasonable consumer, and the information regarding the nature of the Defects would be material to a reasonable consumer due to the catastrophic consequences of the Fire-Related Defect.

165.    Defendant committed fraudulent and unfair business acts and practices, in violation of § 17200, when it concealed the existence of dangers and risks and the nature of the dangers and risks posed by the Defective Vehicles, while representing in its marketing, advertising, and other broadly disseminated

materials, that the Defective Vehicles were reliable and safe, and were warranted against defects. Defendant's representations and active concealment of the dangers and risks posed by the Defective Vehicles were likely to mislead the public with regard to the true defective nature of the Defective Vehicles.

166.   Defendant also violated the unlawful prong of the UCL by violating the reporting requirement of Federal Motor Vehicles Safety Standard ("FMVSS") 573, which requires a motor vehicle manufacturer's to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related. *See* C.F.R. § 573.6

167.   Defendant further violated the unfairness prong of the UCL by failing to properly address the recall of the Defective Vehicles. The recalls have proceeded unreasonably slowly in light of the safety-related nature of the Defects, and, on information and belief, have not yet commenced nearly seven months after BMW first announced the recall.

168.   Defendant further violated the unfairness prong of the UCL because the acts and practices set forth in the Complaint, including the manufacture and sale of Defective Vehicles, caused harm to consumers that greatly outweighed any benefits associated with those practices.  Defendant's conduct has also impaired competition within the automotive vehicles market and has prevented the Class from making fully informed decisions about whether to purchase or lease Class

Vehicles and/or the price to be paid to purchase or lease Class Vehicles.

169.   Plaintiffs and the Class have suffered injuries in fact, including the loss of money and Vehicle value as a result of Defendant's unfair, unlawful, and/or deceptive practices.  As set forth in the herein, Plaintiffs and the Class relied on the misrepresentations and/or omissions of Defendant with respect of the safety and reliability of the Vehicles in purchasing or leasing those vehicles.   Had the Plaintiffs and Class known the true nature of the Defect at issue, they would not have purchased or leased their Class Vehicles or paid as much for them.

170.   All of the wrongful conduct alleged herein occurred in the conduct of Defendant's businesses. Defendant's wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated due to BMW's failure to repair or replace the Defective Vehicles.

171.   As a direct and proximate result of Defendant's unlawful, unfair, and deceptive practices, the Class is entitled to restitution.

172.   Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin the Defendant from continuing its unfair practices, and any other available equitable and injunctive relief.

**COUNT VI**
**Violation of California's False Advertising Law ("FAL")**
**Cal. Civ. Code §§ 17500, *et seq*.**
**(On Behalf of the California Class and California Fires Class)**

173.  Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

174.  The FAL makes it "unlawful for any person to make or disseminate, or cause to be disseminated before the public in this state … in any advertising device … or in any other means whatsoever, including over the Internet, any statement, concerning … personal property or services, professional or otherwise, or performance or disposition thereof, which is untrue or misleading and which is known, or which by the exercise of reasonable care should be known, to be untrue and misleading."

175.  Defendant is a "person" under Cal Civ. Code § 1761(c)

176.  Class members are "consumers," as defined by California Civil Code § 1761(d), who purchased or leased one or more Defective Vehicles.

177.  Defendant participated in misleading and deceptive acts or practices that violated the CLRA, Cal. Civ. Code §§ 1750, *et seq.*, as described above.

178.  Defendant participated in misleading and deceptive acts or practices that violated the UCL, Cal. Civ. Code §§ 17200, *et seq.*, as described above.

179.  BMW engaged in advertising and public representations with the intent to directly or indirectly dispose of personal property, namely, BMW

vehicles, and/or induce the public to enter into sales or lease contracts relating to the Vehicles described herein.

180.    BMW's advertising was untrue or misleading and caused injury to Plaintiffs and the Class, resulting in loss of money because the representations misled consumers into believing that the Defective Vehicles were safe and warranted against defects when, in fact, the Vehicles contain an inherent Fire-Related Defect that causes spontaneous fires that has gone unrepaired.

181.    In making and disseminating the representations regarding the Defective Vehicles' safety; namely, that they were warranted and free from material defects as herein alleged, BMW knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading, and thus acted in violation the FAL.

182.    Plaintiffs and the Class overpaid for the Defective Vehicles and incurred out-of-pocket expenses as a result of this false advertising. Plaintiffs and Class members are entitled to relief, including full restitution and/or disgorgement of all revenues, earnings, profits, compensation, and benefits which BMW may have obtained as a result of such false advertising.

## COUNT VII
## Violations of Nevada Consumer Fraud Statute
## Nev. Rev. Stat. § 41.600
## (On Behalf of the Nevada State Class and Nevada Fire Class)

183.   Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

184.   The Nevada Consumer Fraud Statute permits "an action to be brought by any person who is a victim of consumer fraud." Nev. Rev. Stat. § 41.600(1).

185.   Plaintiffs and Defendant are "persons" within the meaning of the statute.

186.   The Defective Vehicles are "goods" within the meaning of the statute.

187.   Consumer fraud is defined as any deceptive trade practice as defined in Nev. Rev. Stat. §§ 598.0915 to 598.0925 in the Nevada Deceptive Trade Practices Act ("DTPA").

188.   BMW violated the following provisions of the DTPA:

   a. Nev. Rev. Stat. § 598.0915(5): "Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith.";

    b.   Nev. Rev. Stat. § 598.0915(7): "Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model.";

    c.   Nev. Rev. Stat. § 598.0915(9): "Advertises goods or services with intent not to sell or lease them as advertised.";

    d.   Nev. Rev. Stat. § 598.0915(15): "Knowingly makes any other false representation in a transaction.";

    e.   Nev. Rev. Stat. § 598.0923(2): "Failing to disclose a material fact in connection with the sale of... goods.";

    f.   Nev. Rev. Stat. § 598.0923(3): "Violating a state or federal statute or regulation relating to the sale or lease of goods or services."; and

189. In violation of Nev. Rev. Stat. § 598.0915(5), BMW knowingly misrepresented that the Defective Vehicles were safe, reliable, and warranted against defects, among the other representations described herein. Instead, as alleged, the Defective Vehicles harbored a dangerous Fire-Related Defect that caused Vehicles to spontaneously catch on fire.

190. In violation of Nev. Rev. Stat. § 598.0915(7), BMW represented that the Defective Vehicles were of a certain standard, quality, and grade; namely, that

they were designed and manufactured to be free from material defects and safe to drive. Instead, as described herein, BMW had exclusive knowledge that the Defective Vehicles harbored a dangerous Fire-Related Defect.

191.    In violation of Nev. Rev. Stat. § 598.0915(9), Defendant advertised the Defective Vehicles as being safe, reliable, high-quality, and free from defects, among other statements, despite knowing of the Fire-Related Defects. As described herein, Defendant nevertheless continued to sell and market the Defective Vehicles using the same representations and warranties, which demonstrated an intent not to sell the Vehicles as advertised.

192.    BMW also violated Nev. Rev. Stat. § 598.0915(15) in the course of its representations and advertisements regarding the Defective Vehicles by concealing the material defects in Plaintiffs' Vehicles as described herein and otherwise knowingly misrepresenting material facts regarding the existence and effect of the Defects in public statements and communications with its customers, and engaging in activities with a tendency and capacity to deceive with intent that others rely upon their concealment, suppression, or omission in connection with the sale and marketing of the Defective Vehicles.

193.    In violation of Nev. Rev. Stat. § 598.0923(2), BMW failed to disclose that the Defective Vehicles had a dangerous Fire-Related Defect in connection with the sale of its Vehicles.

194.   In violation of Nev. Rev. Stat. § 598.0923(3), BMW violated the FMVSS governing a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in the vehicle has been determined to be safety related.  *See* 49 C.F.R. § 573.6. As described herein, BMW learned of the Fire-Related Defects years before disclosing them to the NHTSA.

195.   BMW's unfair or deceptive acts or practices were likely to and did, in fact, deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of their Vehicles.

196.   BMW knew or should have known that its conduct violated the Nevada Consumer Fraud Statute.   BMW's concealment of the Defects in Plaintiffs' Vehicles was material to Plaintiffs' decision whether to purchase the Defective Vehicles.

197.   As a direct and proximate result of BMW's violations of the Nevada Consumer Fraud Statute, Defective Vehicle owners and lessees have suffered injury by being deprived of the benefit of their bargain because the Vehicles they purchased or leased were worth less than they would have been if they were free from dangerous defects and loss of out-of-pocket expenses.   Had Defective Vehicle owners and lessees been aware of the Defects, they would have either not purchased or leased their Defective Vehicles or would have paid less for them.

198.   Under Nev. Rev. Stat. § 41.600(3)(a), Plaintiffs and the Class seek monetary damages for the harm caused by BMW's violations of the Consumer Fraud Statute as alleged herein.

199.   On May 18, 2018, Plaintiffs provided written notice, through a demand letter sent via certified U.S. mail, return receipt requested, regarding violations of the Nevada Consumer Fraud Statute, and demanded that BMW remedy the below-referenced violations.

**COUNT VIII**
**Violations of Magnuson-Moss Warranty Act**
**15 U.S.C. §§ 2301, *et seq*.**
**(<u>On Behalf of the National Class and National Fire Class</u>)**

200.   Plaintiffs reallege and incorporate each allegation contained in the preceding paragraphs of this Complaint as if fully set forth herein.

201.   15 U.S.C. § 2310(d)(1) provides a claim for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty to obtain damages and other legal and equitable relief. As explained herein, Defendant failed to comply with the terms of its express and implied warranties with regard to the Defective Vehicles.

202.   BMW is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act ("MMWA), 15 U.S.C. § 2301(4)-(5).

203.   The Defective Vehicles are "consumer products," as defined by 15 U.S.C. § 2301(1).

204.   Plaintiffs and Class members are "consumers," as defined by 15 U.S.C. § 2301(3).

205.   BMW's express warranties are "written warranties" within the meaning of the MMWA, 15 U.S.C. § 2301(6).  The Defective Vehicles' implied warranties are further covered under 15 U.S.C. § 2301(7).

206.   BMW breached these warranties by, *inter alia*, selling BMW Vehicles that contained material defects in the blower motor and/or PCV valve heater, concealing these defects, failing to repair the Defective Vehicles in a timely manner, and failing to compensate owners or lessees of the Defective Vehicles for the loss of value and expenses related to the Defects.

207.   Without limitation, the Defective Vehicles share a common Defect in that they are equipped with defective components that carry the risk of fire, leaving occupants of the Defective Vehicles vulnerable to fire, crashes, serious injury, and death.  Defendant has admitted that the Vehicles are defective by issuing a recall.

208.   Plaintiffs Patlan and Cornell notified BMW of its breach of its express warranties by personally contacting BMW after learning of the Defects and attempting to obtain immediate repair and replacement from BMW.

209.  Defendant was provided notice of its breach through its own knowledge of the Defects by instituting a recall, the instant Complaint, and communications transmitted by Plaintiffs and Class before or within a reasonable

amount of time after Defendant issued the recalls and the allegations of fire dangers became public.

210.    Plaintiffs also provided written notice, through a demand letter sent via certified U.S. mail, return receipt requested, regarding violations of the MMWA, and demanded that BMW remedy the below-referenced violations.

211.    Affording BMW further opportunity to cure its breach of written warranties would be unnecessary and futile here because Defendant initiated a recall of the Defective Vehicles. Also, at the time of sale of each Defective Vehicle, Defendant knew, should have known, or was reckless in not knowing, of its misrepresentations concerning the Defective Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defect.

## PRAYER FOR RELIEF

Plaintiffs, on behalf of themselves, the Class, and all Subclasses, respectfully request that the Court:

a.    Certify the Class and Subclass pursuant to Fed. R. Civ. P. 23 and appoint Plaintiff and their counsel to represent the Class and Subclasses pursuant to Fed. R. Civ. P. 23(g);

b.    Award Plaintiffs, the Class, and Subclass monetary damages as allowable by law;

c.      Award Plaintiffs, the Class, and Subclass pre-judgment and post-judgment interest as allowable by law;

d.      Award Plaintiffs, the Class, and Subclass reasonable attorneys' fees and costs as allowable by law;

e.      Award Plaintiffs, the Class, and Subclass all appropriate equitable relief; and

f.      Award Plaintiffs, the Class, and Subclass all such further relief as allowable by law and equity.

## JURY TRIAL DEMANDED

Plaintiffs, on behalf of themselves, the Class, and all Subclasses, demand a trial by jury on all issues so triable.

Dated:   May 22, 2018                          SHEPHERD, FINKELMAN,
                                               MILLER &  SHAH, LLP

                                               /s/ *James C. Shah*
                                               JAMES C. SHAH
                                               NATALIE FINKELMAN BENNETT
                                               475 White Horse Pike
                                               Collingswood, NJ  08107
                                               Tel: 856-858-1770
                                               Fax: 866-300-7367
                                               jshah@sfmslaw.com
                                               nfinkelman@sfmslaw.com

                                               BRIAN C. GUDMUNDSON
                                               BEHDAD C. SADEGHI
                                               ZIMMERMAN REED LLP
                                               1100 IDS Center, 80 South 8th Street
                                               Minneapolis, MN 55402

Tel:  612-341-0400
Fax: 612-341-0844
brian.gudmundson@zimmreed.com
behdad.sadeghi@zimmreed.com

*Attorneys for Plaintiffs*